| | | |
|---|---|---|
| **MARY ANNE L. COURTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 1:05CV0094 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying Mary Anne L. Courter's application for Disabled Widow's Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Complaint. (Document Number 11). Defendant has filed a Brief in Support of the Answer. (Doc. No. 12).

## Procedural History

On January 21, 2004, plaintiff filed her application for Disabled Widow's Insurance Benefits, claiming that she became unable to work due to her disabling condition on January 15, 1999. (Tr. 32-34). This claim was denied initially, and following an administrative hearing,

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated December 9, 2004. (Tr. 24-28, 12-20). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 15, 2005. (Tr. 7, 3-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on September 23, 2004. (Tr. 144). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting the exhibits into the record. (Tr. 145). Upon the request of plaintiff's counsel, the ALJ indicated that he would leave the record open for thirty days after the hearing so plaintiff could submit additional medical records. (Id.).

The ALJ then examined plaintiff, who testified that she was born on April 13, 1950, and that she obtained a high school diploma. (Tr. 146). Plaintiff stated that she does not have a technical degree or associates degree. (Id.). Plaintiff testified that she married Michael Courter in 1985, and that he died in 1997. (Id.). Plaintiff stated that she was living by herself at the time of the hearing. (Id.). Upon being asked what she did during a regular day, plaintiff responded "[a]nything I want." (Tr. 147). Plaintiff testified that she is able to cook, clean, and complete all of the necessary household chores. (Id.). Plaintiff stated that she takes her time completing tasks, due to the muscle spasms and chronic fatigue she experiences. (Id.). Plaintiff testified that she has a driver's license and she is able to drive. (Id.).

Plaintiff testified that she took early retirement in 1999 at the suggestion of her employer.

(Id.). Plaintiff stated that she missed a lot of work due to her chronic pain and difficulty staying awake. (Id.). Plaintiff testified that her employer allowed her to lie down whenever she wanted , but this arrangement did not "go over real well" with her co-workers and it resulted in added stress for her. (Id.). Plaintiff stated that the added stress caused muscle tension and headaches. (Id.). Plaintiff testified that when she suffers from episodes of stress, she needs to lie down, take an over-the-counter pain reliever, and relax. (Tr. 147-48). Plaintiff stated that she has also tried massages, hot baths, and other holistic remedies to help her relax. (Tr. 148).

The ALJ asked plaintiff whether she would be able to work at a position that allowed her to sit, stand, and walk at will, and that would not require much contact with the public. (Id.). Plaintiff testified that she retired from a position like the one the ALJ described. (Id.). Plaintiff stated that she did not believe that she could perform that position at the time of the hearing. (Id.).

Plaintiff testified that during the hearing, she was experiencing pain across her back and shoulders, down to her toes. (Id.). Plaintiff stated that she was also experiencing numbness in her right hand. (Id.). Plaintiff testified that she has to lie down to relieve tension several times throughout the day. (Tr. 149). Plaintiff stated that on a typical day, she takes a 45-minutes walk in the morning, after which she is exhausted. (Id.). Plaintiff testified that she then lies down and sleeps for about an hour-and-a-half. (Id.). Plaintiff stated that when she wakes from her nap, she does housework and other necessary chores. (Id.). Plaintiff stated that she lies down and rests again in the afternoon for one to two hours. (Id.). Plaintiff testified that when she lies down, she is sound asleep. (Id.). Plaintiff stated that she tried to do volunteer work, but she was unable to maintain a regular schedule. (Id.).

Plaintiff testified that her physical difficulties culminated after she took early retirement in 1999. (Id.). Plaintiff stated that her impairments have not gotten any worse since that time. (Id.). Plaintiff testified that she has really good days when she feels "pretty normal," and she has bad days where she does not leave the house for four to five days. (Tr. 149-50). Plaintiff stated that she has more good days than bad days. (Tr. 150). Plaintiff testified that she has gone two weeks without having any physical problems. (Id.). Plaintiff stated that her symptoms can be triggered when she moves the wrong way. (Id.). Plaintiff testified that she experienced a lot of grief after she retired due to the deaths of her husband and brother. (Id.). Plaintiff stated that her grief increases her physical pain. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she has fibromyalgia,[2] back pain, and a sleeping disorder. (Tr. 151). Plaintiff stated that she also takes medication for depression. (Id.). Plaintiff testified that in the week prior to the hearing, she did not leave her house from Monday until Friday because she was not "physically capable of doing it." (Id.). Plaintiff stated that in the month prior to the hearing, there was probably a two-week period during which she felt normal and engaged in regular activities. (Tr. 152). Plaintiff testified that she can usually only go about two weeks before she has a spell where she experiences back and neck pain for several days, requiring her to lie down. (Id.).

The ALJ then examined the vocational expert, Michael Lala, who testified that plaintiff's past work as a rural mail carrier was described by plaintiff as heavy work, yet classified by the

---

[2]A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution; additionally, there must be point tenderness in at least 11 of 18 specified sites. Stedman's Medical Dictionary, 671 (27th Ed. 2000).

Dictionary of Occupational Titles as medium, unskilled work. (Tr. 153). The ALJ asked Mr. Lala to assume a hypothetical individual who was 54 years old, with a high school education, who could perform light work, and is limited to frequent climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, and fingering; with a mild limitation regarding attention, concentration, understanding, memory, and pace. (Id.). Mr. Lala testified that the individual could not perform plaintiff's past work because plaintiff's past work was classified as medium. (Id.). Mr. Lala stated that the individual could perform the full range of light, unskilled work. (Id.).

The ALJ next asked Mr. Lala to assume that the hypothetical individual is required to take four fifteen-minute unscheduled breaks every eight-hour workday. (Tr. 154). Mr. Lala testified that there is no work that the individual could perform with these limitations. (Id.).

Plaintiff's attorney indicated that he had no questions for Mr. Lala and that he did not wish to make a closing statement. (Id.).

**B.    <u>Relevant Medical Records</u>**

The record reveals that plaintiff presented to Dr. Arnold Faber on June 8, 2000. (Tr. 81). Dr. Faber noted that plaintiff had a history of depression, mild myofascial disease,[3] and

---

[3]Myofascial pain syndrome is characterized by muscle pains when there is nothing apparently wrong with the muscle. These pains are often accompanied by localized spasm which can be induced by something touching on a sensitive area on the muscle (the "trigger point"). Patients with this complaint are often suspected of malingering but there are probably underlying physical causes. Myofascial pain syndrome can follow trauma and it is often due to working in awkward positions or postures. It is treated, and generally helped by improved posture, exercises and in some cases by physical therapy to the trigger points so that the person can continue in their job. See J. Stanley McQuade, <u>Medical Information Systems for Lawyers</u>, § 6:201 (1993).

fibromyalgia.  (Id.).  Dr. Faber stated that plaintiff had done "fairly well" on Prozac[4] and Wellbutrin.[5]  (Id.).  Upon examination, Dr. Faber found that plaintiff appeared to be doing well and was healthy.  (Id.).  He refilled plaintiff's Prozac and Wellbutrin.  (Id.).

Plaintiff presented to Aftab Khan, M.D. on June 9, 2000, for an examination and evaluation at the request of the Bureau of Disability Services.  (Tr. 86-90).  Plaintiff's complaints were described as myofascial pain syndrome and depression.  (Tr. 86).  Plaintiff reported that she was diagnosed with myofascial pain syndrome in 1992.  (Id.).  Plaintiff stated that she suffers from muscle spasms in the upper and lower back, hips, and shoulders everyday, almost every hour, which she described as a squeezing sensation.  (Id.).  Plaintiff reported that she also experiences muscle tightening, which feels like she has knots in her muscles.  (Id.).  Plaintiff stated that chiropractic manipulations and heat therapy help slightly, but do not relieve the symptoms completely.  (Id.).  Plaintiff indicated that she was unable to perform her daily activities.  (Id.).  She reported that she can walk one block, or about fifty feet, before she has to stop due to the muscle spasms.  (Tr. 87).  Plaintiff stated that she can lift ten to twenty pounds, but she has difficulty carrying that amount of weight due to the muscle spasms.  (Id.).  Plaintiff denied experiencing any tingling or numbness.  (Id.).  Plaintiff reported experiencing depression for most of her life.  (Id.).  She indicated that she has had several suicide attempts, her last attempt occurring ten months prior.  (Id.).  Plaintiff stated that she takes medication, but still feels depressed and lonely.  (Id.).  Upon physical examination, plaintiff had no limitation of motion of

---

[4]Prozac is an antidepressant indicated for the treatment of depression.  See Physicians' Desk Reference (PDR), 962-63 (54th Ed. 2000).

[5]Wellbutrin is an antidepressant indicated for the treatment of depression.  See PDR at 1301-02.

any joint. (Tr. 88-89). Dr. Khan found mild muscle spasms in the upper and lower back area, yet plaintiff did not have any limitation of motion of the back or of the lumbar[6] spine. (Tr. 89). No muscle atrophy was noted. (Id.). Plaintiff could forward flex to 90 degrees, and her gait was normal. (Id.). Plaintiff was able to get on and off the table, tandem walk, walk on her toes and heals, squat, hop on one leg, walk fifty feet without any problems, and lift ten pounds without any problems. (Id.). Dr. Kahn found that plaintiff was mildly depressed, had mild paraspinal muscle spasms in the upper and lower back, and mild swelling of the right wrist. (Tr. 90). Dr. Kahn stated that all of plaintiff's range of motions and fine movements were normal. (Id.). Dr. Kahn's diagnostic impression was myofascial pain syndrome and history of depression. (Id.). He stated that plaintiff's behavior during the thirty-five-minute examination was good and her ability to relate and her memory were intact. (Id.).

On March 13, 2001, Dr. Faber reported that plaintiff had a history of multiple problems, mostly chronic back pain, although plaintiff indicated that she had been "doing very well." (Tr. 79). Dr. Faber stated that plaintiff also has "significant depression." (Id.). Plaintiff complained of only mild back strain. (Id.). Upon physical examination, plaintiff exhibited some limited range of motion in her back and some obvious underlying discogenic disease.[7] (Id.). Dr. Faber indicated that plaintiff's depression was "doing well." (Id.). He continued plaintiff on her

---

[6]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See Medical Information Systems for Lawyers, § 6:27.

[7]Protrusion or herniation of the intervertebral discs of the spinal column, which results in back pain. See Medical Information Systems for Lawyers, § 6:27.

medications.  (Id.).

Plaintiff saw Dr. Faber on September 24, 2001, at which time she had a "host of complaints," one being depression.  (Tr. 76).  Dr. Faber reported that plaintiff was doing "quite well," and indicated that she wanted to try switching to the weekly form of Prozac.  (Id.).  Dr. Faber started plaintiff on the weekly form of Prozac.  (Id.).

On October 6, 2001, Dr. Faber indicated that plaintiff had been feeling depressed since her dosage of Prozac was adjusted.  (Tr. 77).  He increased plaintiff's dosage of Prozac.  (Id.).

Plaintiff presented to Dr. Faber on November 29, 2001, complaining of chronic pain and stress incontinence.[8]  (Tr. 75).  Dr. Faber noted that plaintiff was taking Prozac for her chronic pain, as her pain was consistent with fibromyalgia.  (Id.).  Dr. Faber gave plaintiff samples of Ditropan[9] for her stress incontinence.  (Id.).

Plaintiff presented to Dr. Faber on December 17, 2001, at which time Dr. Faber increased her dosage of Prozac.  (Tr. 75).

Plaintiff presented to Dr. Faber on April 22, 2002, for medication refills.  (Tr. 74).  Plaintiff indicated that she would be moving from the area and inquired about the procedure for transferring her prescriptions and finding a new doctor.  (Id.).  Plaintiff denied having any complaints at that time.  (Id.).  Plaintiff's mental status was described as "good."  (Id.).  Plaintiff exhibited good eye contact, was alert, and talkative.  (Id.).  Dr. Faber's diagnosis was depression.

---

[8]Stress urinary incontinence is the leakage of urine as a result of coughing, straining, or some sudden voluntary movement, due to incompetence of the sphincteric mechanisms. Stedman's at 889.

[9]Ditropan is indicated for the treatment of urinary incontinence.  See PDR at 507.

(Id.).  Plaintiff's prescriptions at that time included Prempro,[10] Wellbutrin, Prozac, and Skelaxin.[11] (Id.).

Plaintiff presented to Lori A. Moyers, D.O. on June 18, 2002.  (Tr. 102).  Plaintiff complained of feeling tired and run down, experiencing soaking sweats at night, swelling in the ankles and feet, swollen and painful joints, stiff muscles and joints, feeling depressed and "down in the dumps," easily upset and irritated, and difficulty sleeping at night.  (Id.).  Dr. Moyers stated that a complete "review of systems" failed to reveal any significant change or new positive findings.  (Id.).  Plaintiff's upper and lower extremities were normal, with no significant joint swelling, or limitation of range of motion.  (Id.).  Plaintiff's back exam revealed no significant restriction in movement or deformity.  (Id.).  Dr. Moyers' impression was:  fibromyalgia, depression, anxiety, and climacteric syndrome.[12]  (Id.).  She recommended that plaintiff return in four months.  (Id.).

Plaintiff saw Dr. Moyers on August 19, 2002, at which time she complained of low back pain, which had been occurring off and on for years, and had been worse in the prior two weeks.  (Tr. 102).  Plaintiff also complained of nausea, which she believed was caused by her medications.  (Id.).  Dr. Moyers' physical examination was notable only for pain in the right sacroiliac (SI)

---

[10]Prempro is indicated for the treatment of symptoms associated with menopause.  See PDR at 3308.

[11]Skelaxin is indicated for the relief of discomforts associated with acute, painful musculoskeletal conditions.  See PDR at 909.

[12]Climacteric syndrome, or menopausal syndrome, is the recurring symptoms experienced by some women during the climacteric period; they include hot flashes, chills, headache, irritability, and depression.  See Stedman's at 1760.

joint.[13]  (Id.).  Dr. Moyers' assessment was stomatitis,[14] sacroiliitis,[15] climacteric syndrome, and depression.  (Id.).  She scheduled plaintiff for a lumbosacral x-ray and continued plaintiff's medications, which included Skelaxin, Prozac, and Wellbutrin.  (Id.).

Plaintiff underwent x-rays of her lumbar spine on August 22, 2002.  (Tr. 105).  The x-rays revealed mild degenerative disc space narrowing at L3-4,[16] L4-5, and L5-S1;[17] mild bilateral degenerative facet changes at L4-5 and L5-S1, ostepenia[18]; minimal levoscoliosis[19] at L4-5; and the sacrum and SI joints were within normal limits.  (Id.).

Plaintiff underwent x-rays of her right shoulder on February 25, 2003, which were within normal limits.  (Tr. 104).

Marsha J. Toll, Psy. D. completed a Psychiatric Review Technique on March 28, 2003. (Tr. 107-20).  Dr. Toll found that plaintiff suffered from depression and anxiety, neither of which satisfied diagnostic criteria.  (Tr. 110, 112).  Dr. Toll expressed the opinion that plaintiff's depression and anxiety caused only mild restrictions of plaintiff's activities of daily living and no limitations in any other areas.  (Tr. 117).  Dr. Toll noted that she spoke with plaintiff via telephone on March 21, 2003, at which time plaintiff reported that she was taking medication for

---

[13]The sacroiliac joint is one of two joints in the pelvis that connect the sacrum (tailbone) and the ilium (pelvic bone).  Stedman's at 937.

[14]Inflammation of the mucous membrane of the mouth.  Stedman's at 1702.

[15]Inflammation of the SI joint.  Stedman's at 1587.

[16]Abbreviation for lumbar vertebrae (L1 to L5).  Stedman's at 956.

[17]Abbreviation for sacral vertebra (S1-S5).  Stedman's at 1586.

[18]Decreased bone density.  Stedman's at 1284.

[19]Abnormal curvature to the left of the vertebral column.  See Stedman's at 1606.

her depression and that she had no current problems related to her depression. (Tr. 119). Dr. Toll stated that plaintiff's complaints are physical in nature. (Id.). Dr. Toll noted that plaintiff's self-care is normal and that she is able to cook, shop, complete household chores, drive, and leave the home almost daily. (Id.).

A state agency medical consultant completed a Physical Residual Functional Capacity Assessment on March 28, 2003. (Tr. 122-29). The medical consultant expressed the opinion that plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, sit a total of six hours in an eight-hour workday, and push or pull an unlimited amount. (Tr. 123). The medical consultant found that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 124-26). It was noted that the medical consultant had spoken with plaintiff via telephone on March 21, 2003, for current functional information, and plaintiff reported that her self-care is normal, and that she is able to cook, shop, drive, and complete household chores. (Tr. 123). Plaintiff indicated that she leaves her home four to five times a week. (Id.).

Plaintiff presented to the Cape Family Practice on eight occasions from April 2003 to July 2004, with various complaints including: fatigue, allergies, sinus infection, obesity, hypothyroid,[20] depression, and vertigo. (Tr. 131-41). Plaintiff's symptoms were treated with medication. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

---

[20]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to weight gain, and drowsiness. Stedman's at 866.

1. The claimant meets all of the nondisability requirements for Disabled Widow's Insurance Benefits set forth in Section 202(e) of the Social Security Act (with the exceptions noted in 20 CFR § 404.335(e)). The claimant's prescribed period begins October 13, 1997 and ends October 31, 2004. On November 8, 2002 the claimant filed an application for Disabled Widow's Benefits.

2. The claimant suffers from history of depression, mild myofascial disease and fibromyalgia that are severe impairments. She does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations Number 4.

3. Based on a thorough analysis of all the evidence, the undersigned finds that the claimant has the residual functional capacity to perform no more than light work activity that involves standing, walking and sitting six hours out of an eight hour workday with frequent climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, and fingering and lifting and carrying 20 pounds occasionally and 10 pounds frequently. Additionally, the claimant has mild limitations with attention, understanding, memory, pace and concentration.

4. The claimant's allegations of disabling pain and limitations, when considered pursuant to the law of the Ninth Circuit Court of Appeals, Social Security Ruling 96-7p, and the pertinent regulations, are not credible and are rejected for the reasons stated in the rationale portion of this decision, which are incorporated by reference herein.

5. The claimant has unskilled past relevant work experience as a mail carrier.

6. Although the claimant cannot perform her past relevant work, she is capable of making an adjustment to work which exists in significant numbers in the national economy. The impartial vocational expert testified that the claimant is capable of performing a full range of light unskilled work. Additionally, Rule 201.13 of the Medical-Vocational Guidelines, Appendix 2, Subpart P, Regulations Number 4, recommend a finding of "not disabled" in this case.

7. The claimant was not under a "disability" as defined in the Social Security Act at any time through the date of the decision.

(Tr. 19-20).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on November 8, 2002, the claimant is not entitled to Disabled Widow's Insurance Benefits under Sections 202(e) and 223, respectively of the Social Security Act.

(Tr. 20).

**Discussion**

**A.    Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  Id.

**B.    The Determination of Disability**

To establish entitlement to Disabled Widow's Insurance Benefits, the following criteria

must be met: (1) the claimant must have attained the age of 50; (2) the claimant must be the

widow of the wage earner; (3) the claimant must be unmarried; and (4) the claimant must be

under a disability as defined in the Act.  See 42 U.S.C. § 402(e)(1).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
 See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff raises two claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain and limitations. Plaintiff also argues that the ALJ erred in determining plaintiff's residual functional capacity.

1.    **Credibility Analysis**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff specifically argues that the ALJ failed to properly apply the Polaski factors.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether she is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work."

Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling pain. Although the ALJ did not cite Polaski, he did cite the proper regulations, 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p. (Tr. 16). As such, there is no error in the omission of a Polaski citation. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).

The ALJ first stated that the medical evidence does not support plaintiff's allegations of disability. (Tr. 15). The ALJ noted that Dr. Khan diagnosed plaintiff with myofascial pain and a history of depression and concluded that plaintiff was only mildly depressed and had mild paraspinal muscle spasms. (Tr. 17, 90). Dr. Khan also found that all of plaintiff's range of motions were normal. (Id.). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ stated that there is no indication that plaintiff's medications are ineffective or that they cause any disabling side effects. (Tr. 17). This is a proper factor, because evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

The ALJ next discussed plaintiff's daily activities. (Tr. 17). Plaintiff testified that she is able to cook, clean, complete all necessary household chores, and drive. (Tr. 147). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258

F.3d 742, 748 (8th Cir. 2001). The ALJ concluded that plaintiff has failed to show the presence of a condition that prevents her from performing all of her normal daily activities. (Tr. 17).

Further, although plaintiff's impairments are long-term conditions, plaintiff worked with these impairments for many years. The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992). Plaintiff has not shown that her condition deteriorated at the time she stopped working.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley, 253 F.3d at 1092. Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

The undersigned does not believe that it is necessary to duplicate findings. All of the findings of the doctors listed below[21] in support of plaintiff's residual functional capacity support the ALJ's determination that plaintiff's allegation that she is disabled, unable to engage in any substantial gainful activity, is not credible. X-rays and examinations of plaintiff further sustain these findings.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating plaintiff's residual functional capacity.

---

[21]Doctors Faber, Kahn, Moyers and Toll.

Specifically, plaintiff claims that the ALJ's residual functional capacity determination was not based upon any of the medical evidence of record. Defendant contends that the ALJ's residual functional capacity finding was based upon substantial evidence in the record as a whole.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 711-712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ concluded as follows with regard to plaintiff's residual functional capacity:

[b]ased on a thorough analysis of all the evidence, the undersigned finds that the claimant has the residual functional capacity to perform no more than light work activity that involves standing, walking and sitting six hours out of an eight hour workday with frequent climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, and fingering and lifting and carrying 20 pounds occasionally and 10 pounds frequently. Additionally, the claimant has mild limitations with attention, understanding, memory, pace and concentration.

(Tr. 17).

The residual functional capacity formulated by the ALJ is supported by substantial evidence in the record as a whole, including the objective medical evidence. The ALJ found that

plaintiff suffers from a history of depression, mild myofascial disease and fibromyalgia, which are severe impairments. (Tr. 14).

With regard to plaintiff's depression, the ALJ stated that Dr. Faber diagnosed plaintiff with a history of depression on June 8, 2000, and noted that plaintiff had done "fairly well" on Prozac and Wellbutrin. (Tr. 81). On June 9, 2000, Dr. Kahn found that plaintiff was only mildly depressed. (Tr. 90). On March 13, 2001, Dr. Faber reported that plaintiff's depression was "doing well." (Tr. 79). On September 24, 2001, Dr. Faber noted that plaintiff was doing "quite well," and indicated that she wanted to try switching to a weekly dosage of Prozac. (Tr. 76). Dr. Faber increased plaintiff's dosage of Prozac on October 6, 2001 and December 17, 2001, due to plaintiff's complaints of increased depression since starting the weekly form of Prozac. (Tr. 77, 75). On April 22, 2002, plaintiff denied having any complaints, and Dr. Faber described plaintiff's mental status as "good." (Tr. 74). Dr. Toll, the state agency psychiatrist, expressed the opinion that plaintiff's depression caused only mild restrictions in her activities of daily living and no limitations in any other areas. (Tr. 117). This evidence reveals that plaintiff suffered from mild depression, which was controlled with medication. The ALJ found that plaintiff has mild limitations with attention, understanding, memory, pace, and concentration due to her depression. This finding is supported by the opinion of the state agency psychiatrist and the records of plaintiff's treating physicians. Significantly, none of plaintiff's treating physicians found that plaintiff's depression caused any functional limitations.

With regard to plaintiff's physical impairments, Dr. Kahn examined plaintiff on June 9, 2000, at which time plaintiff had no limitation of motion of any joint, no limitation of motion of the back, no muscle atrophy, and a normal gait. (Tr. 88-90). On March 13, 2001, Dr. Faber stated

that plaintiff suffered from chronic back pain, although plaintiff indicated that she had been "doing very well." (Tr. 79). Plaintiff complained of only mild back strain and exhibited some limited range of motion and some obvious underlying discogentic disease. (Tr. 79). Plaintiff complained of chronic pain on November 29, 2001, at which time Dr. Faber noted that plaintiff's pain was consistent with fibromyalgia. (Tr. 75). When plaintiff saw Dr. Faber on April 22, 2002, she denied having any complaints. (Tr. 74). On June 18, 2002, Dr. Moyers indicated that a complete review of systems failed to reveal any significant positive findings. (Tr. 102). Plaintiff's upper and lower extremities were normal, with no significant joint swelling, or limitation of range of motion. (Id.). Plaintiff underwent x-rays of her lumbar spine on August 22, 2002, which revealed only mild degenerative disc space narrowing at L3-4, L4-5, and L5-S1; mild bilateral degenerative facet changes at L4-5 and L5-S1; ostepenia; minimal levoscoliosis at L4-5; and normal sacrum and SI joints. (Tr. 105). The state agency medical consultant found that plaintiff's physical impairments limited her to light work. (Tr. 122-29).

The ALJ's determination that plaintiff is capable of performing light work is supported by the opinion of the state agency medical consultant. The state agency medical consultant's opinion was based upon a review of plaintiff's medical records and a telephone conversation with plaintiff, during which plaintiff indicated that her self-care was normal, she was able to cook, shop, drive, and complete household chores. (Tr. 123). Although the opinion of a consulting physician alone does not generally constitute substantial evidence, the ALJ did not rely solely on the opinion of the consulting physician, but also conducted an independent review of the medical evidence and considered plaintiff's testimony regarding her daily activities. The objective medical evidence is not supportive of greater limitations than those found by the ALJ. Rather, the medical record

reveals that plaintiff was treated conservatively and rather infrequently for her impairments. Notably, none of plaintiff's physicians imposed any restrictions on plaintiff due to her physical impairments.

In sum, the ALJ properly considered the medical evidence of record regarding plaintiff's mental and physical impairments, including the opinions of the state agency medical consultants, along with plaintiff's testimony regarding her daily activities, in determining plaintiff's residual functional capacity. Thus, the ALJ's determination that plaintiff was capable of performing light work with mild limitations of attention, understanding, memory, pace, and concentration is supported by substantial evidence in the record as a whole.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this 13th day of March, 2007.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE